**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| MARISSA NICHOLE DAVIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-448-JPK |
| KILOLO KIJAKAZI[1], Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Marissa Nichole Davies filed the present complaint seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her Title XVI application for Supplemental Security Income ("SSI"). *See* 42 U.S.C. § 405(g). The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. *See* [DE 9]. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). After carefully considering the Administrative Record[2] and the parties' briefs [DE 24, 27, 28], the Court now affirms the Commissioner's decision.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security effective July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kijakazi is substituted for Andrew Saul as the defendant in this suit.

[2] The Administrative Record [AR] is found at Docket Entry #18. The page citations in this opinion are to the Bates stamp numbers in the lower right corner of each page.

## BACKGROUND

### A.   PROCEDURAL HISTORY

Plaintiff was 21 years old when she filed her first application for SSI. On April 18, 2018, the Social Security Administration (SSA) denied Plaintiff's first application at the initial level, and Plaintiff did not pursue an appeal.[3] Approximately a year later, on February 14, 2019, Plaintiff filed a second application for SSI alleging disability since around the age of twelve as a result of seizures (epilepsy) and depression. On May 28, 2019, Plaintiff's second SSI application was denied upon agency review at the initial level, and it was again denied on July 9, 2019 at the reconsideration level. Plaintiff filed a written request for a hearing before an administrative law judge (ALJ), and a hearing was held on May 7, 2020. During the hearing, the ALJ questioned Plaintiff's representative about Plaintiff's first SSI application, which was still eligible to be reopened, and Plaintiff's representative stated that Plaintiff was not seeking to have that application reopened. On May 19, 2020, the ALJ issued an unfavorable decision on Plaintiff's second SSI application. On June 3, 2020, Plaintiff filed a request for review by the Social Security Administration ("SSA") Appeals Council. On October 9, 2020, the Appeals Council denied that request. This appeal followed.

### B.   MEDICAL HISTORY

Plaintiff was 32 weeks pregnant when, on May 23, 2017, at the referral of her obstetrician, she first saw her current treating neurologist, Dr. Jody Neer.  Before seeing Dr. Neer, Plaintiff had been treated for epileptic seizures in Ohio. Her diagnoses of record included asthma, headaches, migraines, and a seizure disorder. [AR 299]. Dr. Neer reviewed Plaintiff's previous neurology

---

[3] These facts are stated in the initial level agency decision on Plaintiff's second SSI application, as well as in the ALJ's decision on that second application. *See* [AR 15, 92]. But there is no independent documentation of them in the record..

notes, which outlined the past management of Plaintiff's epilepsy with the anti-seizure medications Lamictal, Keppra, and Diastat. [AR 298]. Dr. Neer also reviewed Plaintiff's past imaging and medical testing, including (1) two MRIs from October 2008 and September 2011, both showing a "notably smaller right hippocampus than the left"; (2) EEGs (electroencephalograms) from September 2005, October 2007, February 2014, July 2015, and June 2016, all showing brain waves indicative of a seizure disorder; and (3) EEGs from June 2009 and August 2012 that were normal.

Plaintiff reported that her last seizure was eight and a half years before, in November 2008. [AR 298]. Her records indicate that past seizures were severe, but rare and controlled by medication. [AR 298]. When the seizures occurred, they lasted for minutes and Plaintiff had no associated symptoms. [*Id.*]. Because of her pregnancy, Dr. Neer recommended adjusting Plaintiff's dosage of Lamictal. [AR 301]. Plaintiff was encouraged to keep a seizure diary, to contact the office in event of a breakthrough seizure, and to call EMS if a seizure occurred lasting 5 minutes or longer or if there were multiple seizures in succession. [*Id.*]. It also was noted that Plaintiff's ability to drive was restricted unless she was seizure-free for at least 3 months. [*Id.*].

Plaintiff gave birth in July 2017 [AR 63], and, on August 24, 2017, she had a second appointment with Dr. Neer. Plaintiff's only reported concern at that time was "[b]urning mid-forehead pain 2-3 times a week, [which] lasts the day." [AR 294]. Plaintiff indicated that she had not had any recent seizures, and she asked about getting approval to drive. Dr. Neer continued Plaintiff's medications at the same dosages. [AR 295].

On October 18, 2017, Plaintiff was seen at Parkview Medical Center for complaints of right lower quadrant abdominal pain. A CT scan of Plaintiff's abdomen and pelvis was done, which revealed an abnormality in Plaintiff's left hip. [AR 393]. Plaintiff was referred to an orthopedic nurse practitioner for consultation on October 31, 2017. She acknowledged during that

3

consultation that she was aware she had a congenital deformity of the hip, but she denied any left

hip pain from it at that time. A diagnosis of hip dysplasia was noted. The Review of Systems from

the visit also indicates that Plaintiff denied that she suffered from depression. [AR 392].

On November 6, 2017, Plaintiff established treatment with Dr. Bethany McDaniel-

VanderZwaag as her primary care doctor. During the visit, Plaintiff denied any complaints of

depression or anxiety. It was noted that Plaintiff suffered from congenital hip dysplasia [AR 309],

and Plaintiff indicated that she intended to consult with an orthopedic physician on the issue. [AR

311].

Plaintiff was again seen by Dr. Neer for purposes of seizure medication management on

January 4, 2018. Plaintiff reported no seizures, and that she tolerated her seizure medications

(Lamictal and Keppra) without any side effects. [AR 291]. However, Plaintiff complained about

headaches, described as daily, sharp frontal pain, with some nausea, for which she had been taking

Tylenol and ibuprofen. [AR 290]. Dr. Neer noted that Plaintiff had been prescribed Topamax,[4] but

that she did not tolerate it well due to dizziness. Plaintiff stated that she was not able to stay on

task and would like to be on a preventative medication. Dr. Neer discontinued Plaintiff's treatment

with Topamax, continued her treatment with Keppra, and increased her dosage of Lamictal. [AR

291].

On January 23, 2018, Plaintiff had another office visit with Dr. McDaniel-VanderZwaag,

this time seeking treatment for depression. Plaintiff stated that she did not "feel the same since

[her] grandma died," but that her fiancé and his mom thought "it has been going on longer than

that." [AR 315]. Plaintiff explained that she cried, did not sleep well, and was tired and "iffy"

---

[4] Topamax is a prescription medicine used to treat the symptoms of migraine headaches, seizures
and Lennox-Gastaut Syndrome. *https://www.rxlist.com/topamax-drug.htm* (last visited
9/18/2022).

about getting out of bed in the morning. [*Id.*]. She reported being sad but not anxious, and had no thoughts of self-harm. There is also a reference to possibly a complaint about bad headaches. Dr. McDaniel-VanderZwaag diagnosed Plaintiff with a "mild, single current episode of major depressive disorder and fatigue," and prescribed the anti-depressant drug Celexa. [*Id.*]. A month later at a follow-up appointment with Dr. McDaniel-VanderZwaag, Plaintiff reported that she felt much better after taking the Celexa, that she had no more headaches, and that she was sleeping better. [AR 318].

Plaintiff filed her first SSI application approximately two weeks after her appointment with Dr. McDaniel-VanderZwaag, on February 26, 2018. On April 16, 2018, at the request of the SSA, Plaintiff attended a mental consultative examination with Licensed Psychologist Dan L. Boen. Dr. Boen first obtained background information from Plaintiff, who reported that she graduated from high school but had no post high school education, and that she had learning, academic or educational problems while in high school, explaining further that she was in special education and repeated grades. [AR 324]. Plaintiff reported that she had been living with her boyfriend and his parents since 2016 and has two children. Dr. Boen noted Plaintiff's history of seizures and "trouble walking," with "a checkup on her hip" occurring at "the end of March," but no treatment or hospitalization for physical issues. [AR 323]. Dr. Boen also noted Plaintiff's history of mental health treatment, which included treatment with Celexa prescribed by Dr. McDaniel-VanderZwaag for "mental or emotional issues or to aid in sleeping," with no in-patient hospitalization or outpatient mental health counseling. [*Id.*]. Plaintiff told Dr. Boen that her mental and emotional issues began years ago in 2008, but that she also thought they were "due to having her daughter last year." [AR 324]. Plaintiff reported that she had never worked although she had

looked for work in the past two years, and that she "has had difficulty working due to mental and emotional issues." [*Id.*].

Plaintiff's reported mental health or emotional issues and symptoms included not feeling "sad and depressed since [sic] her medication has been working" and having "some trouble concentrating and focusing since she tends to 'doze off.'" [AR 323]. When asked to confirm or deny certain symptoms, Plaintiff confirmed having trouble getting certain thoughts out of her mind; feeling the need to continuously check things; needing less sleep than usual; and feeling unusually angry (but not getting out of control from that anger). [AR 323-324]. Plaintiff also reported having "heard [but not seen] things that were not there that other people do not hear"; hearing voices daily up to a week ago, and sometimes feeling people have been watching her or were out to get her. [AR 324]. Plaintiff denied being fearful or afraid; being nervous in social situations; having anxiety or panic attacks; having thoughts of suicide in the past two years or currently; having nightmares or flashbacks; avoiding places or people due to an unpleasant or painful experience; having more energy than usual; feeling unusually agitated or irritable; feeling unusually emotionally high, manic, or hyper; or having mood swings. [AR 323-324].

For the examination section of his report, Dr. Boen wrote that Plaintiff was unable to tell him the meaning of the proverbs "don't count your chickens before the chickens are hatched" or "there is no reason to cry over spilt milk." [AR 324]. Plaintiff also could not answer questions about what to do if a library book was lost or if she saw a train approaching a broken track. [AR 325]. She could not perform a two-digit addition or a two-digit subtraction problem, and she could not count backwards by 7s starting at 100, or backwards by 3s starting at 20. She could, however, count backwards from 20 by ones. [*Id.*]. Plaintiff could answer the questions "how many days are in a week?"; "why do we celebrate the 4th of July?"; and "how do you make water boil?" But she

could not answer the questions "how many things are in a dozen?" or "what are the four seasons of the year?" [*Id.*]. Plaintiff could give the meaning for the words "apple," "donkey," "diamond," "fur," "chilling," "bacon," and "tent," but not for the words "nuisance," "join," or "armory." [AR 325-326]. When asked to recall three objects immediately and in five minutes, she recalled all three immediately but none in five minutes. [AR 325]. She could, however, recall five digits forward and three digits backward. [AR 326].

Dr. Boen summed up his findings from the above examination results as follows:

> [Plaintiff's] thought form contained auditory hallucinations and paranoid ideation and was concrete with limited ability to think abstractly. [Plaintiff's] consciousness was normal. [Her] concentration was significantly below normal. [Her] immediate recall was mildly below normal. [Her] short-term memory was significantly below normal. [Her] long-term memory was normal. [Her] fund of information was below normal. [Her] level of intelligence was below normal. [Her] judgment was moderately below normal. [Her] insight was significantly below normal.

[AR 326]. For his medical source statement, Dr. Boen wrote: "[Plaintiff] would have trouble understanding what [she] was asked to do on a job." [AR 327]. In addition, she would not be able to remember what she was asked to do on a job, would not be able to concentrate on the job, and would not be able to stay on task. [*Id.*]. Dr. Boen found, however, Plaintiff would be able to get along with coworkers and a boss. [*Id.*]. At the end of his report without any further explanation, Dr. Boen wrote: "Diagnosis: Major depressive disorder, Recurrent episode, with psychotic features." [AR 326].

Plaintiff's first SSI application was denied at the initial level very soon after Dr. Boen issued his report. She did not appeal that decision. Plaintiff's medical treatment following denial of her first SSI application includes the following:

On August 23, 2018, Plaintiff saw a new primary care physician, Dr. Lisa Booth, complaining of diarrhea. She saw Dr. Booth again on October 16, 2018, complaining that she had

been feeling excessively fatigued for the past week. [AR 381]. She explained further that if she sits down in a chair she will fall asleep instantly. When questioned about her past history of depression, she admitted to feeling more depressed than usual, although she stated that she was sleeping fine. Dr. Booth changed Plaintiff's antidepressant medication to Lexapro. The encounter diagnoses include "Other fatigue" and "Mild single current episode of major depressive disorder." [*Id.*].

On October 17, 2018, Plaintiff saw Dr. Neer for an office visit. At this time, Plaintiff reported having had a seizure in June 2018, indicating she was experiencing "high stress" at the time of the seizure. [AR 351]. She also reported "2 [seizures] in last 9 months" (i.e., since her last appointment with Dr. Neer). [*Id.*]. Plaintiff stated that she "feels ok[ay], but does get lightheaded, and is unsure if she is having seizures at night." [*Id.*]. Dr. Neer substituted Plaintiff's Lamictal prescription with an extended release version and replaced her prescription of Keppra with a prescription of Aptiom, another anti-seizure medication. [AR 352-353].

On January 10, 2019, Plaintiff saw Dr. Booth for a follow-up visit, complaining that she had gained weight on Lexapro. [AR 380]. Dr. Booth changed Plaintiff's anti-depressant medication to Wellbutrin.

Plaintiff filed her second SSI application on February 14, 2019. On April 16, 2019, Plaintiff completed a Function Report in which she stated that her activities included caring for her two children and pets, and that she was helped in that care by her fiancé and his parents. [AR 229-230]. She reported that she did not need any special reminders to take care of her personal needs and grooming or to take her medicine. [AR 231]. She also reported that she can go out alone and shop, but cannot drive [AR 232-233], and that her "seizures mess with everything" but that "her medicine helps with these most of the time" [AR 234].

On April 23, 2019, Plaintiff had a follow-up visit for medication monitoring with Dr. Neer. Plaintiff told Dr. Neer that she was having "staring" seizures 1 to 2 times per week. Upon a review of systems, Plaintiff reported fatigue, blurred vision, depression,[5] and post-seizure headaches. [AR 347]. Despite her report of 1 to 2 "staring" seizures per week, Plaintiff said she was happy with the current medication regimen of Lamictal and Aptiom. Dr. Neer continued Plaintiff on the same dosage of Lamictal but doubled the dosage of Aptiom. [AR 347-348].

On the same day as her appointment with Dr. Neer, Plaintiff completed a Seizure Questionnaire as part of her SSI application in which she reported that she had "staring" seizures one to two times per week lasting about a minute each, with the most recent one having occurred on April 20, 2019. [AR 239]. Plaintiff also reported a grand mal seizure on April 5, 2019, involving falling down and body convulsions. [*Id.*]. Plaintiff's report to Dr. Neer that same day did not include any mention of a grand mal seizure. [AR 347-348]. There are no reports in the record from any third-party who may have witnessed these seizures and no indication that Plaintiff sought medical treatment for them at the time.

On May 1, 2019, Dr. Neer wrote a letter in support of Plaintiff's SSI application. Dr. Neer states in the letter that he has "been managing [Plaintiff's] condition since 2017, and despite medicinal intervention and management, [Plaintiff] has continued to have seizures and abnormal EEG's." [AR 361]. Dr. Neer opined further:

> At any time [Plaintiff] is susceptible to have a seizure in which she may injure herself or others. For this reason, she has not been cleared to drive. A seizure may interrupt her when walking, sitting, or working in general and it may cause lapse in thinking, concentration

---

[5] Dr. Neer's notes indicate that Plaintiff's medications at this time included the anti-depressant Prozac (fluoxetine). [AR 349]. But the treatment notes in the record from Dr. Booth, the prescribing physician, skip from January 10, 2019 when Plaintiff was switched to Lexapro, to June 2, 2019 where the comment is made that Plaintiff "started on [P]rozac 10 mg daily the first part of May" [AR 378], without any indication of when or why the switch was made.

and memory. Following an event there is a postictal period when recovery occurs.

Due to the nature of her condition and symptoms exhibited [Plaintiff] is unable to be in any work environment.

[AR 361].

Plaintiff's second SSI application was denied at the initial level on May 28, 2019. The "Evidence of Record" portion of the initial level Disability Determination Explanation lists two consultative examination reports from Dr. Boen, one received on May 22, 2019 [AR 92] and one received on April 16, 2018 [AR 95]. But the record before this Court includes only the April 16, 2018 Consultative Report.[6] The state psychological evaluator began by addressing the paragraph B listing criteria,[7] finding that Plaintiff had mild limitations in three areas of mental functioning (understanding, remembering, or applying information; interacting with others; and adapting or managing oneself), and a moderate limitation in one area of mental functioning (concentration, persistence or maintaining pace). [AR 97]. The "Analysis of Evidence" portion of the agency psychological examiner's findings refers to Dr. Boen's April 2018 consultative examination report, noting that it includes the diagnosis of recurrent major depressive disorder with psychotic features. [AR 96]. The reviewer also noted that Plaintiff was endorsing functional deficits from

---

[6] The ALJ's decision only references the April 16, 2018 consultative report from Dr. Boen. It's possible the two separate entries in the initial level Disability Determination Explanation are referring to the same report, which the agency received twice (on April 16, 2018 and on May 22, 2019). Or else, Dr. Boen examined Plaintiff on two separate occasions and for some reason the second report is not part of the record before this Court. Because neither Plaintiff nor the Commissioner mentions a second report that is missing from the record, the Court assumes that either it does not exist or it was intentionally left out of the record with both parties' knowledge and consent.

[7] The paragraph B listing criteria refers to the four functional areas that the SSA must analyze and rate when a claimant contends she has work limitations from mental impairments, which functional areas "correspond to the requirements of 'paragraph B' of the Agency's mental impairment listings." *Schmidt v. Astrue*, 496 F.3d 833, 844 n.4 (7th Cir. 2007).

her mental impairments, and then there is a reference to "requesting a current MSE from AMS." [*Id.*]. Although the Court does not know what the reference means, it could be suggesting that another mental status examination was needed to evaluate the "altered mental state" claim (i.e., Dr. Boen's diagnosis of a psychotic feature in Plaintiff's depression). The reference is followed by a notation about an "MSE 05/2019," although the Court has not been able to find a May 2019 MSE in the record. The psychological examiner indicates that the missing May 2019 MSE states that Plaintiff "endorsed sadness related to parental responsibilities [and] since giving birth [in] 2017"; did "not endorse significant mood swings"; and—seemingly significant to the issues in this appeal—"report[ed] emotional/mental issues have *not* limited her ability to work but seizures have." [*Id.* (emphasis added)].[8]

Despite a paragraph B finding of a mild limitation in understanding, remembering, or applying information, the state psychological evaluator assessed Plaintiff's mental RFC to include a moderate limitation in her abilities to "understand and remember detailed instructions," with no significant limitations in Plaintiff's abilities to "remember locations and work-like procedures" or "understand and remember very short and simple instructions." [AR 101]. Consistent with the

---

[8] The missing May 2019 MSE is the third discrepancy in the record that the Court has noted so far in this opinion. *See* footnotes 5 and 6, *supra*. Whether they are somehow related, the Court cannot say. But neither party complains of any error, let alone prejudicial error, from them. While on the subject, the Court notes one more record discrepancy that neither party acknowledges or complains about. The ALJ's decision relies on the state agency psychological reviewers' opinions on Plaintiff's first SSI application when those opinions are not included in the current record. *See* [AR 19 ("The former State Agency psychological opinion is persuasive because it is consistent with the evidence of record, detailed in the next two paragraphs.")]. As to this omission, the Court concludes that even if the ALJ erred in relying on the former state agency psychological reviewers' opinions that are not part of the record to find only a mild limitation in the noted areas of mental functioning, that error was likely harmless because of the testimony the ALJ elicited from the VE under a third hypothetical, which included a host of additional mental limitations not included in the ALJ's RFC determination, as discussed later in this opinion. And, again, neither party has so much as pointed out, much less complained of, any discrepancy in the record.

paragraph B finding of a moderate limitation in the area of concentration, persistence or maintaining pace, the state agency psychological evaluator assessed Plaintiff's mental RFC in this area to include a moderate limitation in Plaintiff's abilities to "carry out detailed instructions"; "maintain attention and concentration for extended periods"; and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." [AR 101-102]. At the same time, the state agency psychological evaluator found no significant limitations in Plaintiff's abilities to "carry out very short and simple instructions"; "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances"; "sustain an ordinary routine without special supervision"; or "make simple work-related decisions." [*Id.*]. In what appears to be an attempt to reconcile these seemingly somewhat conflicting findings, the state agency psychological evaluator opined that the "[e]vidence suggests [claimant] can understand, remember, and carry out detailed, but not complex tasks"; that she "can attend to tasks for a sufficient period to complete" them; and that she "can manage the stresses involved with detailed work-related tasks." [AR 102].

As to Plaintiff's seizure disorder, the state agency physical reviewer noted that Plaintiff had a significant increase in reported incidents of seizure activity at her recent neurological examination, which the state agency reviewer also noted were not corroborated by any increased ER visits or increased medical care. [AR 98]. The reviewer found no exertional limitations, but did find that Plaintiff had postural limitations from her seizure disorder related to balancing, climbing ramps, stairs, ladders, ropes and scaffolds, and avoidance of exposure to hazards. [AR 99-100].

On June 3, 2019, Plaintiff saw Dr. Booth for another follow-up visit for her depression. It was noted that she had started taking Prozac in the first part of May, but she reported that she still felt slightly depressed and tired all the time, had no motivation, and wakes up several times during the night. Plaintiff also reported that she has frequent headaches and at times feels light-headed when ambulating. Dr. Booth increased Plaintiff's dosage of Prozac. [AR 378].

On July 9, 2019, the state agency reviewer at the reconsideration level affirmed the findings of the initial level reviewer with no additional comments.

On November 14, 2019, Plaintiff saw Dr. Neer for medication management. She reported having had "a few staring seizures," and that she was "[u]nsure if she is having [them] at night – [she] awakens with a bad [headache]." [AR 397]. Nevertheless, Plaintiff stated that she was happy with her current medications. [*Id.*]. Plaintiff also reported that she was "[n]ot working [and] not on disability yet." [*Id.*].

On December 19, 2020, Plaintiff had a follow-up appointment with Dr. Booth for her depression. Plaintiff reported that her current dosage of Prozac was not working, and that she wanted to try taking Vyvanse, a drug used to treat attention deficit hyperactivity disorder (ADHD). She described trouble concentrating, focusing, and staying awake, and she said that she "always feels tired." She also reported having had poor concentration and trouble staying on task when she was in school. [AR 396]. Dr. Booth continued Plaintiff on Prozac and added Vyvanse. Her Encounter Diagnoses included "Mild single current episode of major depressive disorder" and "Poor concentration." [*Id.*].

Plaintiff saw Dr. Booth again on February 10, 2020, with her chief complaint again being poor concentration. She stated that she felt she could use a higher dose of Vyvanse, has trouble

concentrating and focusing, but is sleeping well and has a normal appetite. Dr. Booth increased the dosage of Vyvanse. [AR 395].

On March 11, 2020, Plaintiff saw Nancy Hall, PA for an orthopedic consultation concerning left hip and back pain. Plaintiff reported at this time that she was no longer taking Prozac. She reported that she had been having left hip and lower back pain for the last few weeks, and that crossing her legs and sometimes weight-bearing activity increased the discomfort. She will occasionally take Tylenol for the pain, and it did not affect her sleep. PA Hall noted that Plaintiff had a baby 3 years ago, denied any recent injury, and had a known history of left hip dysplasia that was evaluated in Orthopedics in 2017. PA Hall also wrote that Plaintiff "is able to do all activities of daily living" and that she "only gets groin pain if she crosses her left ankle over her right knee." [AR 388]. A hip X-ray revealed a congenital irregularity in the left hip, which was consistent with Plaintiff's history of hip dysplasia. [AR 389]. No acute abnormality was noted, and lumbar spine imagining indicated only normal findings. [AR 386-387]. PA Hall recommended that Plaintiff do some stretching and strengthening exercises, wear a heel lift in her left shoe, and use ice heat or muscle rubs when her hip become sore or painful. If the pain failed to improve, then a course of physical therapy would be warranted. [AR 390].

### C.   HEARING TESTIMONY

At the hearing held on May 7, 2020, the ALJ first questioned Plaintiff why she was disabled back in 2008, the alleged onset year of her disability. Plaintiff answered that she was born with hip dysplasia. The ALJ thoroughly questioned Plaintiff about her lack of treatment for hip pain over the years, as well as indications in the medical records that she did not experience significant pain in the hip and only took Tylenol when she needed it.

The ALJ next questioned Plaintiff about her seizures. A good deal of the ALJ's questioning related to if and to what degree Plaintiff was involved in telling her treating neurologist, Dr. Neer, what to say in the letter he wrote in support of Plaintiff's disability application. The ALJ also questioned Plaintiff extensively about perceived inconsistencies between Dr. Neer's letter and Dr. Neer's treatment notes. The ALJ then asked Plaintiff how many seizures she was currently having. Plaintiff responded that she was still having the "staring" kind of seizure once or twice a day,[9] and that she has the grand mal kind of seizure every other day.[10] Plaintiff also said that she wakes up with headaches and sometimes it is because "it's going to rain but the[n] other times … [it is] because a seizure [happened] when [she was] sleeping." [AR 53]. The ALJ again asked Plaintiff about the frequency of these seizures and when they began, and Plaintiff again repeated that she had been having daily seizures, and every-other-day grand mal seizures, since April 2019. She explained that she has not gone to the hospital when the grand mal seizures happen because her previous doctor in Ohio told her she only needed to go to the hospital if the seizure lasts longer than two minutes, which none have. When pressed again about whether these seizures actually started as far back as April 2019 with the frequency she was now claiming, Plaintiff agreed with the ALJ that the last time she saw Dr. Neer, which was in November 2019, she had reported only a "few staring seizures," and, further, that she "did not report grand mal seizures." She then explained that she began having the daily "staring" seizures and every-other-day grand mal seizures a few weeks *after* she saw Dr. Neer in November 2019, despite having minutes earlier

---

[9] Plaintiff explained that a "staring seizure" is when somebody is talking to her and "then [she] just stare[s] off into space," without blinking or moving. The ALJ asked how long it lasts, and Plaintiff answered "it lasts like maybe 35 minutes," but then added there were "a few where it lasted a minute," which suggests that she meant to initially say 35 seconds. [AR 54].

[10] Plaintiff described a grand mal seizure as "fall[ing] to the floor" with "foam and stuff com[ing] out of [her] mouth and [she] shake[s]." [AR 55].

testified that these seizures began with this frequency in April 2019. The ALJ asked Plaintiff whether she had been told that these seizures that had started a few weeks after November 2019 were going to stay that severe for 12 months, to which Plaintiff responded "I haven't had an opportunity [to go back to see Dr. Neer] yet." [AR 57-58]. She admitted that she had not called Dr. Neer to report the increased seizures. She stated that she had kept a seizure log, but had not turned it into Dr. Neer because she had not yet seen him again.

The ALJ then questioned Plaintiff about her depression, which she said started about when she gave birth in July 2017. Plaintiff testified that the antidepressant medication worked for a while and then things became bad again around May 2018. She testified that her depression kept her from working because there were times she did not want to be around anyone. She reported that the Vyvanse she was taking helped with her concentration but "it's not helping as much." [AR 70]. She explained that what she meant when she said she was in "special education" while in high school was that she was allowed to take as long as she needed on her work and on tests. [*Id.*]. She said that she has not worked since turning 18, and that she filled out applications but no one would hire her because of her depression and her seizures. She does not think she can work because she is "not good at … anything at all." [AR 71].

## FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one

through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or combination thereof, that are severe. If there are no severe impairments, the claimant is not disabled. If there are, the ALJ determines at the third step whether those severe impairments meet or medically equal the criteria of any presumptively disabling impairment listed in the regulations. An affirmative answer at step three results in a finding of disability and the inquiry ends. Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which is "an administrative assessment of what work-related activities an individual can perform despite his limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of the inquiry, the ALJ determines whether the claimant is able to perform past relevant work given the claimant's RFC. If the claimant is unable to perform past relevant work, the ALJ determines, at the fifth and final step, whether the claimant is able to perform any work in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(i)-(v). A positive answer at step five results in a finding that the claimant is not disabled while a negative answer results in a finding of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

## <u>THE ALJ'S DECISION</u>

The ALJ made the following findings relevant to Plaintiff's SSI application:[11]

---

[11] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

1.      The claimant has not engaged in substantial gainful activity since February 14, 2019, the date of her SSI application.[12]

2.      The only severe impairment the claimant has is a seizure disorder.

3.      The claimant does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments.

4.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she should not climb ropes, ladders or scaffolds but can kneel, crouch, crawl, bend, and stoop without limitations of function. She can occasionally use ramps and stairs. She should avoid work within close proximity to open and exposed heights and open and dangerous machinery (such as open flames and fast-moving/exposed blades). The claimant is limited from concentrated exposure to excessive heat (such as when working outside or within a boiler room or a greenhouse). She should also avoid work within close proximity to very loud noises (level 5), such as a fire alarm, or very bright/flashing lights, such as a strobe, more than occasionally. She should not drive motor vehicles.

5-8.    The claimant has no past relevant work, and therefore transferability of job skills is not an issue. She is considered to be a younger individual age 18-49 during the period at issue. She has at least a high school education and is able to communicate in English.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including kitchen helper, store stocker, and laundry worker.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 14, 2019, the date the current application was filed.

[AR 17-31].

---

[12] The ALJ cited to the filing date of the application because that is the earliest point at which an individual may receive SSI. *See* 20 C.F.R. § 416.335.

## STANDARD OF REVIEW

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). Apart from a legal error, however, the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The ALJ must articulate an analysis of the evidence to allow the reviewing court to trace the path of reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record, and he or she "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## ANALYSIS

Pursuant to the Listing of Impairments, an epilepsy disorder must be "documented by a detailed description of a typical seizure and characterized by A, B, C, or D." 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.02. Paragraph A requires documentation of "Generalized tonic-clonic seizures occurring at least once a month for at least 3 consecutive months." Paragraph B requires documentation of "Dyscognitive seizures occurring at least once a week for at least 3 consecutive months." Paragraph C requires documentation of "Generalized tonic-clonic seizures occurring at least once every 2 months for at least 4 consecutive months; and a marked limitation in one of the following: (1) Physical functioning; (2) Understanding, remembering, or applying information; (3) Interacting with others; (4) Concentrating, persisting, or maintaining pace; or (5) Adapting or managing oneself." And paragraph D requires documentation of "Dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months; and a marked limitation in" one of the same five areas listed in paragraph C. The requirement of a "detailed description of a typical seizure" means "at least one detailed description of [the claimant's] seizures from someone, preferably a medical professional, who has observed at least one of [the claimant's] typical seizures," and if the claimant experiences more than one type of seizure," then the requirement applies to each type. *Id.* § 11.00(H)(2).

The ALJ found that there was no medical evidence in the record to support a finding that Plaintiff has a seizure disorder that meets the requirements of Listing 11.02, and Plaintiff does not dispute that finding. Instead, Plaintiff argues that the ALJ improperly evaluated the medical

opinions of Dr. Boen and Dr. Neer insofar as Plaintiff's mental limitations from depression and seizures are concerned.[13]

Because Plaintiff's SSI application was filed after March 27, 2017, the ALJ was required to follow 20 C.F.R. § 416.920c in evaluating the opinions of both Dr. Boen and Dr. Neer.[14] The primary change from the old rule governing evaluation of medical opinions (§ 416.927) is that the new rule (§ 416.920c) eliminates the requirement under the old rule that the Commissioner give "controlling weight" to an uncontroverted treating medical opinion. Apart from this change, the new rule requires the Commissioner to consider the same factors as before in weighing medical opinions. The factors are: (1) supportability used by the medical source to support the opinion; (2) consistency of the medical opinion with the other evidence in the record; (3) relationship with the claimant, including the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship; (4) specialization of the medical source; and (5) other factors that tend to support or contradict a medical opinion. *Id.* §§ 416.920c(c)(1)-(5). The new regulations state that supportability and consistency are the most important factors to consider, and that the other three factors only require discussion if it is appropriate for the determination. *Id.* § 416.920c(b)(2).

---

[13] The ALJ found that Plaintiff did not allege any work-related limitations from her hypertension, asthma, or headaches, and Plaintiff does not challenge that finding either. In addition, although Plaintiff did allege at the hearing that she suffered limitations from her hip dysplasia, and the ALJ discussed the evidence as it relates to that issue in his decision, Plaintiff does not raise any argument related to that topic in this appeal.

[14] As a consultative examiner, Dr. Boen's opinion technically falls under the category of a "prior administrative medical finding" rather than a medical opinion. *See* 20 C.F.R. § 416.913(a)(5). However, the rules applicable to the ALJ's evaluation of medical opinions also apply to the ALJ's evaluation of prior administrative medical findings. *See id.* § 416.913a(b)(1).

A.    DR. BOEN

As previously noted, in April 2018 Plaintiff attended a consultative evaluation with Dr. Boen as part of her prior SSI claim. Relevant findings, described in greater detail earlier in this opinion, included below normal short-term memory demonstrated by Plaintiff's performance on tasks such as five-minute recall and repeating number sequencing. Plaintiff also had difficulty with proverb interpretation and concrete thinking, although she was able to correctly answer several questions testing her fund of knowledge and vocabulary. After reporting the results of his mental examination, Dr. Boen opined that Plaintiff "would have trouble understanding[,] "cannot remember[,]" "would not be able to concentrate[,]" and "would not be able to stay on task" at a job. The ALJ found these opinions unpersuasive, concluding that they were not well supported by Dr. Boen's report and were otherwise inconsistent with available evidence.[15]

Plaintiff argues that, in rejecting Dr. Boen's opinion regarding her abilities to understand, remember, concentrate, and stay on task, the ALJ failed to establish a logical bridge because the ALJ did not explain how the cited portions of Dr. Boen's report were inconsistent with Dr. Boen's opinions. For instance, Plaintiff asserts that "[t]he ALJ opinion does not explain how being able to repeat 5 digits forwards and at least 3 backwards is inconsistent with … being unable to remember what [she is] asked to do on a job." [DE 24 at 10[16]]. But that argument is misleading in that the ALJ did not say this finding was inconsistent with Dr. Boen's opinion. Instead, the ALJ pointed out that Dr. Boen's findings in this regard suggest that Plaintiff's memory deficiencies were not

---

[15] The ALJ did find one aspect of Dr. Boen's opinion to be supported by his examination and consistent with other findings of record—the opinion that Plaintiff could get along with coworkers and a boss. The ALJ credited Dr. Boen's opinion in this instance over the opinion of the state agency psychological consultants, who suggested a slightly greater restriction than Dr. Boen did. Plaintiff does not take issue with the ALJ's treatment of Dr. Boen's opinion in this regard.

[16] Citations to the parties' briefs are to the CM/ECF page numbers at the top right of the page.

as bad as Dr. Boen's broadly worded opinion suggested, meaning his opinion was not well supported. Beyond that, the ALJ found there was little support for saying that, because a person has difficulty recalling any of three words after a brief delay, that means the person would be unable to remember what she is asked to do on a job. The ALJ noted that Dr. Boen found that Plaintiff's "long term memory was normal and her immediate memory was only 'mildly' below normal." Dr. Boen's below normal findings related to Plaintiff's short term memory. *See* [AR 19 ("short term memory was 'significantly' below normal")]. Short term memory refers to "[t]he capacity to recognize, recall and regurgitate small amounts of information … shortly after its occurrence," while immediate memory refers to "[m]emory for events or information in the last few hours or days." *https://medical-dictionary.thefreedictionary.com/immediate+memory* (last visited 9/19/2022). Not all jobs require a person to "recognize, recall and regurgitate small amounts of information shortly after its occurrence." The ALJ did not err in concluding that Dr. Boen's opinion that Plaintiff "cannot remember" what she was asked to do on a job was "not well supported" by his limited finding of a "significantly below normal" short term memory with normal long term memory and only a mild limitation in immediate memory.

The Court also cannot say that the ALJ improperly concluded that Dr. Boen's finding of Plaintiff's below normal intelligence was insufficient support for his opinion that Plaintiff would have trouble understanding information on a job. The ALJ acknowledged that Dr. Boen's report "indicate[s] finding that the claimant exhibited difficulty interpreting proverbs, limited insight and judgment, … [and] difficulty with simple math calculations, and concrete thinking." [AR 19]. But the ALJ pointed out that Plaintiff "answered most of the questions regarding fund of knowledge and vocabulary correctly." [*Id.*]. Plaintiff argues that the ALJ fails to explain how the 3 out 5 items Plaintiff answer correctly (how many days in a week, how to make water boil, and why we

celebrate the 4th of July) were more relevant to Plaintiff's mental abilities than the two items Plaintiff could not answer (how many things are in a dozen and the names of the four seasons in the year).[17] According to Plaintiff, the ALJ failed to explain "how … the data points that did make it to paper, including [Plaintiff] not knowing common sense behaviors such as what she should do if a library book was lost … [and] not knowing the meaning of common sense sayings such as 'don't count your chickens before the chickens are hatched' … fail to support Dr. Boen's assessment that [Plaintiff] would have trouble understanding … in a workplace." [DE 24 at 11]. But the ALJ did not say those findings were not supportive of Dr. Boen's assessment of Plaintiff's abilities to understand; only that they were the only basis for Dr. Boen's assessment, and, as such, insufficient support for that assessment.

In concluding that Dr. Boen's examination findings were insufficient to support his opinion, the ALJ noted that Plaintiff graduated from high school and that her records included no specific data that supported her report to Dr. Boen of a history of special education. [AR 19; *see also* AR 219 (Exhibit 1E, Disability Report from claimant, indicating that she did *not* attend special education)].[18] Plaintiff asserts that the ALJ does not explain "how these details related to whether

---

[17] *See* [DE 24 at 11; *see also id.* at 10-11] (where Plaintiff mixes memory issues with fund of knowledge issues, stating: "being able to repeat back 5 digits forward … in no way demonstrates ability to … 'pull a dozen of those files.' (She did not know how many things are in a dozen).") (footnote omitted); *id.* at 11 ("Likewise as to 7 of 10 basic vocabulary words, including not knowing what 'Nuisance,' 'Join,' and 'Armory' mean.")].

[18] The ALJ does seem to have misread Dr. Boen's report when he wrote that "[the claimant] told Dr. Boen that she never repeated a grade in school." [AR 19]. Dr. Boen's report states that Plaintiff "*did* repeat grades." [AR 324 (emphasis added)]. A Disability Report completed by Plaintiff on March 8, 2019 (Exhibit 1E), however, indicates that Plaintiff completed high school in 2015. [AR 219]. This reported date suggests Plaintiff in fact did complete high school on time for her age (Plaintiff was born in July 1996). Thus, although the ALJ may have inaccurately stated what Dr. Boen reported, his ultimate conclusion was correct, which is that the record does not support a finding that Plaintiff skipped grades in high school.

24

Dr. Boen's opinion is consistent with the evidence of record." [DE 24 at 14]. It is true that the ALJ does not specifically spell out the significance in his decision. "There is no requirement of such tidy packaging, however; [the Court] read[s] the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (citations omitted)). And it is common sense that the ALJ cited to these facts as evidence that Plaintiff had a sufficient intellectual capacity to work in a job, contrary to Dr. Boen's opinion, which was based on his limited examination findings. In further support of this conclusion, the ALJ also noted that "[t]he record contains no evidence that the claimant has been formally diagnosed with any sort of cognitive, intellectual, or learning disorder." [AR 20]. The Court cannot say that the ALJ erred in concluding that Dr. Boen's opinion regarding the limiting effects of Plaintiff's below normal intelligence on her ability to work was not well supported by his own limited examination findings or by other evidence in the record.

Plaintiff also takes issue with the ALJ's rejection of Dr. Boen's opinion regarding her ability to concentrate, persist, or maintain pace. The ALJ found only a mild limitation in this area, which the ALJ acknowledged was less restrictive than Dr. Boen's opinion that Plaintiff "would have trouble concentrating and staying on tasks because she had significantly below normal concentration." [AR 21]. The concentration section of Dr. Boen's examination indicates that Plaintiff could not perform two math calculations, could not count backwards by 7s starting at 100, could not count backwards from 20 by 3s, but could count backwards from 20 by ones. [AR 325]. The ALJ noted that the only concentration abnormality found by Dr. Boen was related to Plaintiff's ability to perform the more difficult two out of three serial counting tasks. [AR 21].[19] Plaintiff

---

[19] The ALJ referenced the math calculations in his discussion of Plaintiff's ability to understand, remember, or apply information, instead of where it appears in Dr. Boen's report under the heading of concentration. [AR 19].

asserts that this part of the ALJ's decision was "confusing because it was Dr. Boen's job to assess the claimant." [AR 24 at 11]. It is not clear what Plaintiff means by this. But if she is suggesting that the ALJ was putting words in Dr. Boen's mouth, that is an inaccurate description of the decision. The ALJ was merely describing Dr. Boen's examination findings before concluding that those findings were insufficient support for Dr. Boen's opinion that Plaintiff would have trouble concentrating and staying on task in a job.

Moreover, the ALJ looked beyond just Dr. Boen's examination findings in concluding there was insufficient support for his opinion. For instance, the ALJ noted that, while Plaintiff takes Vyvanse for her attention problems, there is no evidence in the record that she has been formally diagnosed with attention deficit disorder. [AR 21].[20] The ALJ also considered Dr. Neer's opinion, discussed in greater detail in the next section, that Plaintiff's seizures may cause difficulty with her concentration. The ALJ stated twice in his decision that "[a]t no point did Dr. Neer report that the claimant's seizures would cause moderate, marked, or extreme limitations in the claimant's ability to concentrate, persist, or maintain pace." [AR 19, 21]. Plaintiff argues the ALJ's comment about Dr. Neer's report "adds no real explanatory power, and amounts to picking and choosing." [DE 24 at 15]. But Plaintiff only cites the page in the ALJ's decision where this comment appears for the second time, ignoring the first time the ALJ made the comment, when, immediately preceding the quoted language, the ALJ stated "[t]his is only a possibility." [AR 19]. It is sufficiently clear from the decision as a whole that the ALJ meant that Dr. Neer's opinion was only about what *might* happen if a seizure occurs, with the ALJ concluding that Dr. Neer's opinion

---

[20] The ALJ's finding in this regard is supported by the evidence, which shows that Plaintiff first sought medical treatment for poor concentration in December 2019, when she asked her primary care physician to prescribe her Vyvanse. Her doctor obliged, writing only "poor concentration" as the diagnosis. [AR 396].

thus says very little about whether Plaintiff *actually* has limitations in concentration from frequently occurring seizures. The Court cannot say that the ALJ drew an illogical or unsupported conclusion from the evidence. Indeed, Dr. Neer's treatment notes throughout the entire time period at issue indicate in the Review of Symptoms section that Plaintiff repeatedly denied suffering any memory loss or impairment, both before and after she reported her more recent seizures, evidence on which the ALJ also relied in reaching his conclusions regarding the persuasiveness of Dr. Boen's opinion.[21]

"Cherry-picking is ignoring portions of the record that are unfavorable to the ALJ's decision." *Baird v. Berryhill,* No. 1:17-CV-472-PRC, 2018 WL 4874757, at *5 (N.D. Ind. Oct. 9, 2018) (citing *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016)). Plaintiff points to no findings in the record unfavorable to the ALJ's decision that the ALJ ignored. Instead, Plaintiff points to Dr. Boen's and Dr. Neer's opinions of more than mild limitations in concentration. The ALJ addressed Dr. Boen's and Dr. Neer's opinions, however. "It is not 'cherry-picking' to find some portions of testimony less credible than others." *Id.*

Other relevant evidence the ALJ considered in finding Dr. Boen's opinion not persuasive included Plaintiff's report that she cared for her two young children and additionally helped care for the home she shared with her boyfriend and his parents by preparing food, cleaning, and shopping. [AR 19, 21]. Plaintiff otherwise reported no mental difficulties or inconsistencies in performing these tasks. Although an ALJ's comment about a claimant's daily activities when

---

[21] *See* [AR 22 ("Moreover, during [Dr. Neer's] visits, [Plaintiff] actually denied insomnia and memory impairment. She reported headaches for which she used over the counter medications. Objective medical findings were for normal memory and orientation, normal sensation, normal cranial nerves, etc. She had no anxiety, no agitation, no anhedonia, appropriate behavior, sufficient knowledge, normal insight, normal concentration, normal attention and normal judgment. She was oriented times four (Exhibit 2F). These findings and observations and statements indicate no mental limitations of function.")].

assessing her alleged symptoms is often criticized in the case law, it is not always an improper consideration. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) ("An ALJ can appropriately consider a claimant's daily activities when assessing his alleged symptoms."); *see also* 20 C.F.R. § 416.929; *Shumaker v. Colvin*, 632 F. App'x 861, 866 (7th Cir. 2015) (noting the ALJ permissibly "evaluated [the plaintiff's] daily activities against her asserted impairments in assessing whether she was exaggerating the effects of her impairments"); SSR 16-3p, 2017 WL 5180304, at *7 (S.S.A. Oct. 27, 2017) (daily activities are among the factors an ALJ may use to evaluate the intensity, persistence, and limiting effects of an individual's symptoms). The question is whether the ALJ placed "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," by, for example, "ignor[ing] [the claimant's] qualifications as to *how* [s]he carried out those activities." *Craft*, 539 F.3d at 680 (emphasis in original) (quoting *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)). ALJs also err if they equate the performance of daily activities with the ability to perform full-time, competitive work. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons …, and is not held to a minimum standard of performance, as she would be by an employer."). Here, the ALJ accurately noted that Plaintiff testified she did these things without any qualifications about needing help. Plaintiff asserts without more that the cited daily living activities are not inconsistent with an inability to concentrate, persist, or maintain pace. [DE 24 at 15]. But the Court cannot say that the ALJ erred in citing to this evidence, which does show an ability to stay on task as to the activities in question.

Another argument Plaintiff makes regarding Dr. Boen's opinion about her limitations in concentration, persistence or pace is that her mental abilities as shown by Dr. Boen's examination

do not "translate to any kind of aptitude whatsoever in, say, detail-oriented jobs the ALJ places her in such as officer helper, sorter, and merchandise marker." [DE 24 at 11]. But the VE identified those jobs only if the individual's RFC was restricted physically to the exertional limitations for light work (i.e., no more than 10 pounds frequently and 20 pounds occasionally) with the additional exertional limitations of being able to sit, stand, or walk up to 8 hours with the option to alternate postural positions as needed while staying on task. [AR 86]. The ALJ did not impose any exertional restrictions in Plaintiff's RFC; she found that Plaintiff could perform "a full range of work at all exertional levels" (with certain identified non-exertional limitations). [AR 23]. The ALJ based this physical RFC finding on the lack of evidence in the record that Plaintiff suffered physical limitations from her hip dysplasia. *See* [AR 30-31]. Plaintiff does not challenge that part of the ALJ's RFC finding.

More relevant to the ALJ's step five findings is the VE's testimony that a person with no exertional limitations (plus the additional non-exertional limitations the ALJ identified) and no mental limitations--*i.e.,* a person with Plaintiff's RFC--could perform the jobs of kitchen helper, store stocker, and laundry worker. [AR 82-84]. Plaintiff does not argue that the jobs of kitchen helper, store stocker, and laundry worker could not be performed with her limitations in concentration, persistence, and pace.[22] Her argument instead relates to the three jobs the ALJ

---

[22] Based on only mild limitation findings in the four areas of mental functioning, the ALJ did not impose any mental restrictions in Plaintiff's RFC. [AR 23]. The VE's testimony was that the jobs of kitchen helper, store stocker, and laundry worker did not require reading other than a grocery list, or doing math other than adding or subtracting [AR 83-84], which also encompasses Plaintiff's mental RFC of no restrictions. As an alternative step 5 finding, the ALJ found that, even if Plaintiff had a laundry list of mental restrictions, the same three jobs (kitchen helper, store stocker, and laundry worker) could be performed [AR 30], a finding that was supported by the VE's testimony in response to a second hypothetical the ALJ posed. [AR 85-86]. This alternative step 5 finding further refutes Plaintiff's argument that the jobs identified by the ALJ could not be performed by a person with Plaintiff's mental limitations.

identified as an alternative basis for his step 5 finding, i.e., *if* Plaintiff could *not* perform a full range of light work. [AR 31].[23] Plaintiff does not argue the ALJ erred in finding no exertional limitations in her RFC, so the ALJ's alternative finding is not relevant.

Another challenge Plaintiff makes to the ALJ's treatment of Dr. Boen's opinion has to do with Dr. Boen's diagnosis of a major depressive disorder with psychotic features. To begin with, Plaintiff asserts that the ALJ "fails to pinpoint disagreement with any of the multipronged diagnostic criteria for Major Depressive Disorder." [DE 24 at 16]. It is not clear from this one-sentence assertion what exactly Plaintiff's argument is. To the extent that Plaintiff is alluding to the ALJ's step two finding that she did not suffer from a mental impairment, i.e., depression, that was severe, "she has not developed an argument the ALJ overlooked medical evidence" that would demonstrate the severity of her depression, so the argument is waived. *Overton v. Saul*, 802 F. App'x 190, 193 (7th Cir. 2020) (citing *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (underdeveloped arguments are waived)); *cf. Sosinski v. Saul*, 811 F. App'x 380, 381 (7th Cir. 2020) (even if the ALJ did not offer more than a perfunctory analysis of a listed impairment, the court will "not reverse if the claimant fails to show that [s]he meets the criteria for that listing"); *Neyhart v. Comm'r of Soc. Sec.,* No. 3:17-CV-00437-MGG, 2018 WL 4659265, at *3 (N.D. Ind. Sept. 28, 2018) ("Generally, a physician's diagnosis alone is insufficient to establish the impairment" (citing 20 C.F.R. § 404.1521, *see also* 20 C.F.R. § 416.921)).

In any event, "[i]t was [Plaintiff's] burden to establish not just the existence of the condition[ ], but to provide evidence that [it] support[s] specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018). In discounting Dr. Boen's

---

[23] The ALJ offered two alternative step 5 findings, the first with additional mental limitations (*see* note 22, *supra*), and the second with the physical restriction of light work discussed in the text.

opinion of significant limitations based on his diagnosis of a major depressive disorder with psychotic features, the ALJ stated that Plaintiff "denied most of the symptoms back in April 2018 during that exam and she reported it became worse the next month or two." [AR 29]. Plaintiff asserts that, by this statement, "the ALJ appears to step into Dr. Boen's own exam." [DE 24 at 16]. But the ALJ was merely observing, accurately, what Dr. Boen's report states. Plaintiff then states: "[T]he ALJ appears to seize on statements by [Plaintiff] such as that she has been on medication for mental or emotional issues for two to three months, and she 'has not felt sad and depressed since her medication has been working …' But the ALJ does not list out these things even." [*Id.*]. Again, it is unclear what Plaintiff means by this. She appears to be suggesting that the ALJ's analysis is lacking because "the ALJ does not list" the exact statements in Dr. Boen's report that Plaintiff cites, and instead summarized those statements by saying that Plaintiff "denied most of the symptoms back in April 2018 during that exam and she reported it became worse the next month or two." That argument, however, misinterprets the Seventh Circuit's "logical bridge" requirement. "[A]n ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). "If a sketchy opinion assures [the Court] that the ALJ considered the important evidence, and the opinion enables [the Court] to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler,* 766 F.2d 284, 287-88 (7th Cir. 1985); *see also Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons—a very deferential standard that we have, in fact, deemed 'lax'" (internal quotation marks and citations omited)); *George A. v. Kijakazi,* No. 18 C 8237, 2022 WL 267937, at *4 n.4 (N.D. Ill. Jan. 28, 2022) (quoting *Stephens,* 766 F.2d at 287: "We do not have the fetish about findings that [the plaintiff] attributes to us. The court reviews judgments, not opinions. The statute requires

31

us to review the quality of the evidence, which must be 'substantial,' not the quality of the ALJ's literary skills.").

The ALJ further stated that Dr. Boen's "findings were based upon a one time exam," and were "not well reflected through the treatment notes extending from May 2017 and through October 2018." [AR 29]. The ALJ acknowledged Plaintiff's "complaints of worsening symptoms in late 2019," but pointed to her testimony that "the medications are helping." [*Id.*]. The ALJ's analysis satisfies the logical bridge requirement.

Plaintiff argues that the ALJ "fails to wrestle with the enduring attempts by [Plaintiff's] healthcare providers, repeatedly without success, to treat her mental healthcare." [DE 24 at 16]. But the ALJ's statement that Dr. Boen's finding of a major depressive disorder with psychotic features was "not well reflected through the treatment notes extending from May 2017 and through October 2018" is sufficient to build a logical bridge. Earlier in the decision, the ALJ outlined the history of Plaintiff's treatment for depression as shown in the treatment notes. The ALJ cited to an October 2017 treatment note where Plaintiff denied any depression.[24] The ALJ then described Plaintiff's complaints of depression, fatigue, etc. in the treatment notes beginning in January 2018. The ALJ said that despite these complaints, the only diagnoses shown were "for 'other' fatigue and a 'mild' single current episode of a major depressive disorder." [AR 22]. The ALJ noted that in February 2018, Plaintiff reported her depression was better on Celexa and she was sleeping better; that in October 2018, she reported one week of fatigue; and that in January 2019, she reported only weight gain on Lexapro. [*Id.*]. The ALJ concluded this review of Plaintiff's treatment history with the following summary: "The above treatment notes reflect no ongoing abnormalities

---

[24] [AR 22 (citing Exhibit 11F (AR 392)]. The Court notes that Plaintiff similarly denied depression on May 23, 2017 [AR 298, 300] and on August 24, 2017 [AR 294, 296].

in mental, psychiatric or neurological functioning. They reflect complaints of depression quickly improved with treatment and generally accompanied by findings for normal functioning with respect to mood, affect, though content, thought processing, behavior, judgment, insight, concentration, persistence, focus, memory, etc." [*Id.*].

Plaintiff presents an alternative version of the same treatment history [DE 24 at 16-18], but the Court cannot say that the ALJ's version is unsupported by substantial evidence. It is not this Court's role to reweigh the evidence. Substantial evidence supports that ALJ's conclusions that Plaintiff's depression was mostly successfully treated with antidepressants,[25] with some medication changes due to complaints of fatigue and unwanted side effects (i.e. weight gain),[26] as also shown by the fact that the focus of Plaintiff's symptom complaints gradually changed over time from depression to inability to concentrate.[27] Indeed, on March 11, 2020, Plaintiff reported she was no longer taking Prozac [AR 388], and there are no records after that date showing treatment for depression.

Plaintiff also ignores the ALJ's analysis that "one consultative psychological examination does not create a duration of twelve consecutive months" [AR 21], and that "there is no evidence in the record that the claimant has sought outpatient treatment by mental health specialists or that

---

[25] [AR 318 (on February 2018, she reported feeling better on Celexa); AR 323 (on April 16, 2018, she reported Celexa "helps with no side effects"); AR 234 (on April 16, 2019, she reported she had limitations in her mental and physical functioning only from her seizures); AR 378 (on June 3, 2019, she reported being only "slightly depressed")].

[26] [AR 381 (on October 16, 2018, chief complaint is fatigue; antidepressant changed from Celexa to Lexapro); AR 380 (on January 10, 2019, she "is here today with complaints of weight gain on Lexapro; antidepressant changed to Welbutrin)].

[27] *See* [AR 396 (December 12, 2019, in follow-up appointment for depression, she reported that Prozac was not working; she states she is having trouble concentrating and focusing and would like to try Vyvanse); AR 395 (on February 10, 2020--chief complaint is poor concentration and she states that she wants to increase the dosage of Vyvanse).

she has been hospitalized on an inpatient basis for a psychiatric reasons during the period at issue

in this decision" [AR 20]. No mental health professional diagnosed Plaintiff with a mental illness

other than Dr. Boen, whose opinions were based on a one-time examination of Plaintiff's

functional abilities, with the diagnosis of a Major Depressive Disorder with Psychotic Features

apparently based solely on Plaintiff's reported symptoms. "[M]edical opinions upon which an ALJ

should rely need to be based on objective observations and not amount merely to a recitation of a

claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)l *see also*

*Winsted v. Berryhill,* 923 F.3d 472, 478 (7th Cir. 2019); *Elder v. Astrue*, 529 F.3d 408, 416 (7th

Cir. 2008).

Plaintiff also overemphasizes the diagnoses of the two primary care physicians as a reason

for finding that the ALJ's treatment of Dr. Boen's opinion was not supported by substantial

evidence. As the ALJ noted, those primary care physicians diagnosed Plaintiff with a "*Mild* single

current episode of major depressive disorder" *e.g.* [AR 378], as opposed to Dr. Boen's diagnosis

of "Major depressive disorder, Recurrent episode, With psychotic features" [AR 326]. A diagnosis

of "mild" major depressive disorder means "[f]ew, if any, symptoms in excess of those required

to make the diagnosis are present, the intensity of the symptoms is distressing but manageable, and

the symptoms result in minor impairment in social or occupational functioning."[28] No medical

professional other than Dr. Boen diagnosed Plaintiff with psychotic features in connection with

her mental health diagnosis,[29] and no psychotic symptoms were ever reported by Plaintiff other

---

[28] DOCUMENTING AND CODING MAJOR DEPRESSIVE ORDERS, available at *https://www.health
alliance.org/documents/24801* (last visited 9/19/2022).

[29] A diagnosis of major depressive disorder with psychotic features means "[d]elusions, psychosis,
or hallucinations are present at any time during the episode." DOCUMENTING AND CODING MAJOR
DEPRESSIVE ORDERS, *supra* note 28.

than during her one-time examination by Dr. Boen. Neither Plaintiff's primary care physicians nor Dr. Boen appear to have administered any diagnostic tools (such as the PHQ-9) in diagnosing Plaintiff. The ALJ did not ignore a line of evidence that conflicted with his findings, and the Court finds that "a reasonable mind [can] accept the evidence as adequate to support the ALJ's conclusion." *Sherry H. v. Kijakazi*, 4:20-cv-52, 2021 WL 3855907, at *5 (N.D. Ind. Aug 30, 2021). Dr. Boen's opinion "had little to do with the record, it would appear that [it] [was] based on [P]laintiff's subjective reports rather than any clinical studies or examinations. As a result, the ALJ's decision was clearly supported by substantial evidence and has to be affirmed." *Elizabeth G. v. Kijakazi*, No. 20 C 1799, 2022 WL 326966, at *9 (N.D. Ill. Feb. 3, 2022).

Finally, although Plaintiff is correct that an ALJ's rejection of an opinion of a consultative examiners is likely to raise eyebrows, *see Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014), as previously noted, the standards for evaluating such an opinion and the opinions of other medical providers are the same. As described above, the ALJ cited to numerous places in the record, including in Dr. Boen's evaluation itself, in explaining why he found that Dr. Boen's opinion was not supported by the record. In sum, the ALJ provided substantial evidence for his findings regarding the persuasiveness of Dr. Boen's opinion.

### B.    DR. NEER

The Court turns next to Plaintiff's arguments about the ALJ's treatment of Dr. Neer's opinion. As an initial matter, Plaintiff asserts that "[t]he ALJ does not explicitly discuss the required factors of supportability and consistence as to Dr. Neer's opinion and thereby fails the promise of the SSA's own regulation." [DE 24 at 18]. But the ALJ explicitly found that Dr. Neer's letter has "little, if any degree of persuasiveness" [AR 20], because Plaintiff's treatment history and report of seizure activity was *inconsistent* with its contents, and it was minimally *supported*

by related treatment notes. [AR 19-20, 21-22, 25, 27-28]. The ALJ does not have to cite to the specific regulation, so long as it is apparent from the decision that the ALJ is applying the correct analysis. Here, it is clear that the ALJ's entire discussion of Dr. Neer's opinion involved application of the inconsistency and supportability factors, and there is no merit to Plaintiff's suggestion that the ALJ did not comply with the express directive of the regulation to "explain how [he] considered the supportability and consistency factors" in the decision. 20 C.F.R. § 416.920c(b)(2).

Furthermore, the Court has reviewed the ALJ's findings on supportability and consistency and finds that they are supported by substantial evidence. Dr. Neer's report indicates that Plaintiff continued to have seizures "since 2017," when Dr. Neer's treatment notes as well as other sources do not reflect that Plaintiff suffered seizures on a regular basis that far back. The ALJ found: "First, on May 23, 2017, [Plaintiff] reported her last seizure was November 2008. Second, on August 24, 2017, it was reported the claimant had 'No seizures' and that he[r] last seizure was November 2008 and she wanted approval for driving. Third, on January 4, 2018, the claimant reported 'no seizures.' She reported 'Last seizure November 2008.'" [AR 22]. The ALJ said that "these factors undermine the claimant's allegations of frequent seizures to Dr. Neer in April 2019 and undermine Dr. Neer's report of ongoing seizures and of memory impairment due to ongoing seizures." [*Id.*]. Moreover, the ALJ noted that, during these visits, Plaintiff also denied insomnia and memory impairment. She reported headaches for which she used over-the-counter medications. Objective medical findings were for normal memory and orientation, normal sensation, normal cranial nerves, etc. She had no anxiety, no agitation, no anhedonia, appropriate behavior, sufficient knowledge, normal insight, normal concentration, normal attention and normal judgment. She was oriented times four. [*Id.*]. The Court has reviewed the record and the treatment notes support the

ALJ's findings. At best, reports and treatment notes in the record indicate few seizures and minimal limitations of mental function.

The ALJ then turned to a discussion of reports of more frequent seizures in Dr. Neer's more recent treatment records. The ALJ stated--in a finding that is supported by substantial evidence in the record—that those more recent reports in the treatment notes are not supported by the overall evidence. The ALJ discussed the timing of Plaintiff's sudden reports of recurring seizures in April 2019, which coincides with her similar disability reports that same month, both of which followed the filing of her second SSI application, and how, despite those reports, Plaintiff never produced a seizure diary or other documentation to show that the reported seizures occurred. [AR 27]. The ALJ also pointed out that, "at hearing, and as questions were raised, the claimant's testimony frequently changed regarding frequency of seizure and onset, with the claimant eventually resting upon allegations of frequent seizures beginning sometime after November 2019," which is "*after* Dr. Neer's letter." [AR 20 (emphasis added)]. The ALJ observed that Plaintiff said Dr. Neer increased her seizure medications in November 2019 because of worsening seizures at that time, but treatment notes reflect no change in medications and instead show that Plaintiff reported being "happy" with her medications at that time. [AR 28]. Furthermore, the treatment notes from November 2019 also show that Plaintiff never called Dr. Neer's office in this time period of supposedly worsening seizures to report any breakthrough seizures, nor did she seek emergency treatment. Plaintiff continued to report she was pleased with her medication's effectiveness and experienced only a limited number of staring spells. And Dr. Neer's "treatment notes do not document observance of any seizure, or post-seizure issues or any neurological or cognitive deficits." [*Id.*]. In short, Plaintiff's self-reports of her seizures to Dr. Neer starting around April 2019, on which Dr. Neer's letter was based, were inconsistent with the frequency and severity

elsewhere reported by Plaintiff, including Plaintiff's reports to Dr. Neer, as shown in Dr. Neer's own treatment records.

Finally, the ALJ pointed out that Plaintiff acknowledged at the hearing that Dr. Neer's letter "was the result of a discussion with him and that he essentially wrote in the letter what she told/asked him to write." [AR 20; *see also* AR 24 ("The record reflects that the claimant admitted at the hearing that she told Dr. Neer what to write in his letter[.]"); AR 28 ("testimony establishes that Dr. Neer's letter is essentially what she asked him to write")]. The Court does not necessarily credit this part of the ALJ's decision. The ALJ's questioning on this issue was leading and at times seemed to assume certain facts. Therefore, the Court cannot say that the transcript of the hearing demonstrates that Plaintiff intended to admit the truth of the ALJ's repeated suggestion that Plaintiff essentially dictated to Dr. Neer what to write in the letter when she responded to the ALJ's leading questions. Still, although the record does not confirm that Plaintiff told Dr. Neer what to write, any error the ALJ committed in assuming that she did do so was harmless, because the ALJ provided numerous other record-supported reasons for rejecting Dr. Neer's letter. In particular, there is substantial evidence that Dr. Neer's opinion was based solely on Plaintiff's sudden reports of experiencing daily seizures, as well as what Plaintiff told Dr. Neer about the impact of those seizures on her memory, rather than on those reports *together with* clinical findings or demonstrated limitations. As previously noted, an ALJ does not err in rejecting as unpersuasive a medical opinion that relies solely on subjective complaints that are unsupported by objective medical evidence. *See Rice*, 384 F.3d at 371; *Winsted,* 923 F.3d at 478; *Elder*, 529 F.3d at 416. Therefore, the ALJ's possibly incorrect characterization of Dr. Neer's letter in this one limited respect did not materially impact his decision. *See, e.g., Jones v. Astrue,* No. 1:07-cv-0698-DFH-WTL, 2008 WL 1766964, at *10, 13 (S.D. Ind. Apr. 14, 2008) (finding that, despite the ALJ's

erroneous statement, "sufficient uncontroverted evidence support[ed] the ALJ's decision for the court to find that the ALJ's mistake did not amount to reversible error"); *cf. Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021) ("To the extent the ALJ did misspeak, any error was harmless.").

Plaintiff makes the additional argument that there was objective medical evidence indicating structural brain deficits consistent with Dr. Neer's opinion, and that the ALJ failed to acknowledge "the import" of that objective medical evidence, which Dr. Neer "would have relied on" in formulating his opinion. [DE 24 at 18]. In the first place, the ALJ did acknowledge a history of abnormal brain testing consistent with Plaintiff's seizure diagnosis. But the ALJ also noted that Plaintiff's last EEG was prior to her start of treatment with Dr. Neer in 2017. [AR 25; *see* AR 397-400]. Moreover, it is telling that Plaintiff asserts Dr. Neer "would have" relied on these objective tests in giving his opinion, because there is no factual basis for asserting *that he did*. The objective findings cited by Plaintiff were from before Dr. Neer began treating Plaintiff. They indicate structural brain deficits that can cause seizures. Whether Plaintiff has structural brain deficits that potentially might cause seizures is not at issue here. Plaintiff asserts that the ALJ's "discussion of [her] seizures as if she is lying about them making them up" does not "match the objective evidence repeatedly documenting sharp waves." [DE 24 at 19]. But objective evidence showing sharp waves in September 2005, October 2007, February 2014, July 2015, as discussed in the background section of this opinion, do not prove the same results would be found for 2019-2020 if testing had been done in that time period. The record contains no objective testing confirming seizures actually occurred in the time period under consideration. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time."); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir.

2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.").[30]

Plaintiff's further discussion about how a person with a "shrunken right hippocampus" is likely to experience loss in memory function is also outside the purview of Dr. Neer's opinion. Dr. Neer did not opine that Plaintiff in fact has suffered a loss of memory function. Dr. Neer merely stated that Plaintiff "is susceptible" to having a seizure, which, if they occur, "may cause lapse[s] in thinking, concentration, and memory." [AR 361]. It is as if Plaintiff is encouraging the ALJ to "play doctor" and infer from those past objective tests that Plaintiff currently suffers memory deficits, when there is no medical opinion to that effect in the record. And in any event, the MRI tests showing a smaller than normal right hippocampus are relevant to whether Plaintiff has epilepsy, which is not the issue here. The issue here is whether Plaintiff is currently suffering frequent seizures that are uncontrolled by her anti-seizure medications and likely to remain so for at least twelve months, and whether those seizures are causing Plaintiff functional mental limitations not accounted for by the ALJ's RFC. Plaintiff points to no evidence that the ALJ failed to consider on those questions. Overall, the ALJ provided fact-specific and well-supported reasons why he found Dr. Neer's opinion letter to be of little persuasive value.

Plaintiff makes a number of other arguments, some of which are undeveloped but which the Court has nonetheless considered. The Court finds it unnecessary to discuss those arguments in any detail. Suffice it to say that there is no merit to Plaintiff's argument that the ALJ had a duty

---

[30] The Court will not remand for further development of the record unless the record contains a "significant omission." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Id.* (quoting *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir.1994)). "Instead a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider." *Id.* Plaintiff has not done that here.

under 20 C.F.R. § 416.920c(b)(3) to discuss the considerations in the regulation other than supportability and consistency, or that the ALJ erred in his credibility assessment of Plaintiff's symptoms.[31]

### C.    THE ALJ'S STEP 5 FINDINGS

Perhaps most important in the case, Plaintiff fails to acknowledge that the ALJ elicited testimony from the VE, which that the ALJ incorporated into his analysis at step 5 of the evaluative process and which renders any error the ALJ might have made regarding Plaintiff's mental RFC harmless. The ALJ's first hypothetical to the VE included no (or very minimal, *see* note 22, *supra*) limitations in mental functioning, and the VE testified the hypothetical individual could perform the jobs of kitchen helper, store stocker, and laundry worker. [AR 82-84]. The ALJ then asked the VE about a hypothetical individual with the same limitations as in the first hypothetical who, in

---

[31] The Court has also looked at the ALJ's statement that Plaintiff's allegations are "not entirely consistent with the medical and other evidence in the record." [AR 24]. Initially, though the issue was not raised by Plaintiff, the Court notes that this is an incorrect statement of the relevant standard. The ALJ is not tasked with determining whether Plaintiff's symptoms are "entirely consistent" with the medical evidence. Rather, the ALJ is instead instructed to determine whether the allegations concerning the intensity, persistence, and limiting effects of these symptoms "can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence." 20 C.F.R. § 416.929(a); *see also id*. § 416.929(c)(4) ("can reasonably be accepted as consistent with the objective medical evidence and other evidence"). As one court explained, the regulatory standard for evaluating a claimant's symptoms is "clearly a different, and a not as rigorous, a standard" than the "not entirely consistent" standard applied by the ALJ. *Minger v. Berryhill*, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018). Nonetheless, an ALJ's use of an oft-repeated phrase such as "not entirely consistent" can be treated as "meaningless boilerplate" if "the ALJ substitutes it for a proper, full-bodied explanation of why credibility is lacking." *Hammerslough v. Berryhill*, 758 F. App'x 534, 539 (7th Cir. 2019). This language is not fatal so long as the ALJ fully explains his conclusions and a "commonsensical reading" of the entire decision suggests no error. *Clemente A. v. Saul*, No. 18 CV 6345, 2019 WL 3973117, *3 (N.D. Ill. Aug. 22, 2019) (declining to find that ALJ's use of boilerplate language tainted the decision with legal error or undermined the entirety of an otherwise-supported symptom assessment where ALJ used the phrase "not entirely consistent" but nonetheless applied the correct standard of "reasonably ... consistent with the objective medical evidence and other evidence"). As discussed above, the ALJ's reasoning was detailed and documented objective medical evidence that refuted Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms.

addition, had a number of more restrictive mental limitations.[32] The VE testified that the same

three jobs—kitchen helper, store stocker, and laundry worker—would be available. [AR 86]. Thus,

even if the ALJ should have found more restrictive mental limitations than he did, as far as the

Court can tell the VE's testimony would cover those further limitations. This conclusion is

confirmed by the fact that Plaintiff identifies no further limitations that were not included by the

ALJ's RFC but Plaintiff contends should be included. *See Dudley v. Berryhill,* 773 F. App'x 838,

---

[32] The ALJ gave a lengthy articulation of these additional mental limitations:

> [T]he hypothetical individual had severe mental impairments …
> plus the following: she can perform simple, routine tasks and
> instructions throughout the workday (the tasks contemplated are
> SVP 1 and 2 type tasks that can be learned within a short period
> through short demonstration, or when beyond short demonstration,
> within up to 30 days, and the tasks may be as simple and mundane
> as taking and packing the same item all day every day, or a task that
> is simple in nature but completed before moving to the next task,
> such as picking up one item, inspecting it for a flaw, such as a bur,
> and placing it into piles or boxes all day every day or such as
> vacuuming, then emptying trash cans and then dusting, in one office
> or room before moving to the next office or room; however, the type
> of tasks remain the same from day-to-day). She is also limited to
> work within a low stress job (defined as requiring only occasional
> decision-making and only occasional changes in the work setting).
> She can tolerate predictable changes in the work environment and
> she can respond or adapt to the changes and cope with the stress and
> engage in the decisionmaking required of such tasks. She can
> engage in the superficial interaction with supervisors, co-workers
> and the public in a manner consistent with SVP 1 and 2 type tasks
> (in which prolonged or intense conversation is not needed for task
> completion although casual conversation can take place if desired).
> She should not perform work requiring reading beyond simple lists
> or math beyond simple adding and subtracting. With such
> limitations in place, the claimant can maintain the concentration,
> persistence, adaptation and even the pace required of such tasks for
> two-hour increments, and for eight-hour workdays-within the
> confines of normal work place breaks and lunches-on a sustained
> day-to-day basis.

[AR 30; *see also* AR 85-86].

842 (7th Cir. 2019) ("Critically, Dudley did not identify any limitations that the ALJ omitted and should have included in the hypothetical question.").

In the end, the two medical opinions Plaintiff relies on stand alone in the record. There simply is little or no medical evidence to support them. As the ALJ found, the limited treatment notes in the record certainly do not. Indeed, those notes often completely contradict the medical opinions. The ALJ properly applied the legal standards set forth in the applicable regulations and Social Security Rulings and what Plaintiff styles as legal error is, in actuality, a disagreement with the outcome of the ALJ's decision after evaluating conflicting evidence. Under the deferential substantial evidence standard of review that applies here, the issue before the Court is only whether a reasonable mind might accept the evidence as adequate to support the ALJ's conclusion. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (citation omitted)). The ALJ's findings are supported by substantial evidence, and therefore the decision is affirmed.

## **CONCLUSION**

Based on the foregoing, the Court hereby **DENIES** the relief sought in Plaintiff's Brief In Support of Plaintiff's Complaint To Review Decision of Commissioner of Social Security Administration [DE 24] and **AFFIRMS** the decision of the Commissioner of the Social Security Administration. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant and against Plaintiff.

ORDERED this 22nd day of September, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT